NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**REGINA FAKNER,**

        **Plaintiff,**

v.                                                   Case No. 6:18-CV-247-ORL-40KRS

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Plaintiff, Regina Fakner, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 8, 10, and the parties' Joint Memorandum, Doc. No. 12.[1]

## PROCEDURAL HISTORY.

In 2014, Fakner filed an application for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.* She alleged that she became disabled on December 30, 2013. R. 145. After this application was denied originally and on

---

[1] In the Scheduling Order, I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 11. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Revised Scheduling Order. *Id.* at 4.

reconsideration, Fakner asked for a hearing before an Administrative Law Judge ("ALJ"). R. 122. An ALJ held a hearing on October 21, 2016. Fakner, accompanied by a lawyer, and a vocational expert ("VE") testified at the hearing. R. 30-67.

After considering the hearing testimony and the evidence in the record, the ALJ found that Fakner was insured under OASDI through December 31, 2017. The ALJ concluded that Fakner had not engaged in substantial gainful activity after the alleged disability onset date. R. 17.

The ALJ found that Fakner had the following severe impairments: degenerative disc disease ("DDD"); disorder of the muscle, ligament, and fascia; urinary incontinence; and pelvic floor dysfunction. *Id.* The ALJ concluded that Fakner did not have an impairment or combination of impairments that met or equaled an impairment listed in SSA regulations. R. 18.

The ALJ found that Fakner had the residual functional capacity ("RFC") to perform sedentary work with the following limitations:

> [S]he must alternate positions every hour. She could occasionally climb ramps or stairs but should avoid climbing ladders, ropes, or scaffolds. Occasionally, she could balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to extreme cold and heat, wetness, humidity, vibrating surfaces and tools, workplace hazards, unprotected heights, and moving mechanical parts. Lastly, she requires a break every two hours.

R. 19. In making this assessment, the ALJ gave little weight to the functional capacity assessment prepared by Wendall Wall, M.D. R. 21. The ALJ also gave partial weight to the statement of Fakner's husband. *Id.* Additionally, the ALJ concluded that Fakner's statements about her functional limitations were partially consistent with the evidence. R. 19.

After considering the testimony of the VE, the ALJ found that Fakner was able to perform her past relevant work as a Pediatric Physician in Medical Consulting. R. 22. The ALJ also found

NOT FOR PUBLICATION

that that there were sedentary, semi-skilled jobs available in the national economy that Fakner could perform. R. 23. Therefore, the ALJ found that Fakner was not disabled. R. 24.

Fakner requested review of the ALJ's decision by the Appeals Council. R. 144. On January 11, 2018, the Appeals Council found no reason to review the ALJ's decision. R. 1-3.

Fakner now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Fakner having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g). A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are adequately stated in the Joint Memorandum and the ALJ's decision, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised to protect Fakner's privacy to the extent possible.

*Testimony and Statements of Fakner and Her Husband.*

Fakner was born in May 1963. R. 145. Fakner received an M.D. degree, and she worked as a licensed pediatrician. R. 36. She also worked as a medical consultant supervising one nurse practitioner from August 2012 through December 30, 2013. *Id.* The medical consulting job involved sitting most of the time, and she could walk around as she wished. R. 49. She usually

worked in the office for 2 to 3 hours. R. 49-50. In a work history report, she wrote that she reviewed charts, signed off on the nurse practitioner's charts and consulted occasionally on a patient if the nurse practitioner needed advice. R. 180. She was found unfit to continue her practice, so she received disability benefits from a private professional disability policy. R. 35.

During the ALJ's hearing, Fakner testified that she had back problems, pelvic dysfunction and urinary incontinence. She had also suffered 4 documented transient ischemic attacks ("TIAs") and two small frontal lobe strokes. She had atrial fibrillation and supraventricular tachycardia ("SVT") at times. She also had Dupuytren's contracture in her left hand. R. 37. Shortly before the hearing, she was involved in a motor vehicle accident ("MVA"), which resulted in injury to 2 discs in her back. R. 38. Fakner received injections in the SI joint and right gluteal tendon after the MVA. She also took pain medication and Soma, a muscle relaxant. R. 38-39. The muscle relaxant helped ease discomfort from her pelvic dysfunction. R. 38.

Fakner took Enablex for urinary incontinence. R. 40. This medication caused a severe headache at the full dose, so she took a half dose. R. 42. She also wore pads for urinary leakage. R. 50. She had participated in pelvic physical therapy. She needed to use a restroom every two hours because she could no longer feel when she needed to use the bathroom. R. 42, 51.

Fakner took medication for her heart conditions, and she took Xanax both to keep her heart rate more regular and for anxiety. R. 43-44.

Fakner testified that sitting too long made her back worse, and that walking aggravated her urinary incontinence. R. 51. If she squatted, she could not get up without assistance. R. 52. When she bent over, she had a heavy feeling in her chest and she was short of breath. R. 54. She

4

could care for her personal hygiene but needed assistance getting out of the bathtub. R. 52. She could not push down and bear weight on her left hand due to pain. R. 55.

Fakner lived with her husband, an internal medicine physician, and her 12-year-old daughter. R. 35, 44. Fakner had a driver's license, and she was able to drive. R. 35. She had a housekeeper and a lawn maintenance person. R. 51, 53. She was able to shop. R. 172. She communicated with friends by telephone, and she went out to eat with others about once a month. She also went to church about once a month. R. 173. In 2014, she flew to Florida from Louisiana to visit her daughter. R. 176. In April 2014, she reported that she walked about a mile 3 times per week. R. 174. She also walked her two small dogs on fairly flat terrain. R. 54. She did not sleep well. R. 56. During a typical day, she drove her daughter to school then went back home and sat or lay down watching television or reading. She did some light housework before picking up her daughter from school. R. 56-57; 170. In the evening, she checked her daughter's homework. R. 57.

In September and October 2014, Fakner reported that her functional capacity diminished. *E.g.*, R. 204-05, 228-29, 232-39, 244-46, 252, 255. On October 4, 2014, she wrote that standing caused urinary incontinence. R. 232. She also reported experiencing 12 anxiety attacks in the previous 3 months. R. 248.

On October 20, 2014, Dr. Ethan Alan Webb, Fakner's husband, completed an adult function report. He wrote that he spent evenings and weekends with Fakner. They went to the movies and on brief trips to shop for food. He indicated that Fakner could do light housework intermittently, pick up their daughter from school and help the daughter with her homework. R. 219-20. Fakner prepared food in the microwave for dinner 3 or 4 times per week. Dr. Webb reported that Fakner

was unable to stand, bend or stoop for prolonged periods of time secondary to pain. If she stood or walked more than 1 to 2 hours, her pain was worse for 1 to 2 days. She needed assistance dressing. She had a limited ability to lift greater than 10 pounds, bend or squat and she was unable to stand/walk more than 1/4 mile at a time due to moderate pain. Fakner spent the day reading and engaged in limited travel. She took Xanax for more than moderate stress. R. 219-25. In sum, Dr. Webb wrote: "Overall most limited in ability to perform activity of daily living. Primary factor is lumbar pain. However, she also had episodes of atrial fib with hospital admit times 6 in the past 10 years." R. 226.

*Treatment Records and Functional Capacity Opinions*.

Pierce D. Nunley, M.D., first encountered Fakner on September 15, 2010, when she complained of discogenic pain. He observed that Fakner was badly deconditioned and needed an appropriate rehabilitation program. R. 289. Upon examination, Mike Brandao, CFNP, observed that Fakner walked without difficulty. She had limitations in all ranges of motion in the lumbar spine and moderate SI joint tenderness. A straight-leg raising test was negative for pain. The assessment was low back pain – discogenic in nature; multilevel lumbar DDD; moderate spondylosis at L4-5; and pelvic girdle dysfunction ("PGD"). R. 291. Fakner reported urinary incontinence with some leaking after standing all day at work. R. 290. The treatment note indicates that Fakner should participate in physical therapy for lumbar stabilization and in the pelvic girdle program. R. 291. On September 29, 2010, Fakner indicated that therapy was not helping tremendously. R. 293.

A lumbar discogram and CT of the lumbar spine were performed on October 14, 2010. R. 295-98. After review of the results of these tests, Dr. Nunley recommended L4-5, L5-S1 fusion

surgery. R. 298, 301. Ajay Jawahar, M.D., scheduled surgery for November 2, 2010, which Dr. Nunley performed. R. 299-300, 326-29. Ten days after the surgery, Fakner was prescribed physical therapy. R. 307. On December 7, 2010, Fakner reported that she had no pain, and her physical examination was normal. R. 309-10.

On January 20, 2011, Fakner continued to report significant relief, noting only a feeling of discomfort in her hip and lower back area especially after exertion. R. 311. On May 2, 2011, Dr. Nunley noted that Fakner was doing quite well and ready to get into a more aggressive exercise program. R. 315. As of November 16, 2011, Dr. Nunley wrote that Fakner was doing extremely well with minimal back pain and no leg pain. R. 317.

On January 20, 2012, Fakner reported that she strained herself during a workout the previously week. Examination showed no hardware failure or instability in the fusion. Fakner still had some tenderness in the pelvic girdle and continued pelvic floor therapy. R. 318. On November 14, 2012, Fakner reported that she had a backache with certain activities but overall she was able to do most of what she wanted to do. R. 323. Dr. Nunley wrote that Fakner was doing quite well and would continue her exercises. R. 322.

Paul G. Cole, M.D., examined Fakner on December 5, 2013 regarding her heart condition. Fakner denied chest pain, chest pressure, palpitations, syncope and shortness of breath. She also denied anxiety, arthralgias, myalgias and musculoskeletal disorders. R. 357. Upon examination, range of motion in the lumbar and sacral spine was within normal limits. R. 359.

Wendell Wall, M.D., was Fakner's primary care physician from some time before January 2013 through 2014. R. 380-91, 428-33, 435-40. On January 10, 2013, Fakner stated that she had not had any episodes of SVT or atrial fibrillation. She complained of chronic back pain, and she

still had some pelvic problems. She was sleeping well. Her examination was normal except for slightly low blood pressure and left elbow bursitis. R. 391. On May 9, 2013 she reported that she had been doing well and her mood was good. She had no episodes of TIAs, and her stress level was good. She was stable and doing well on medication and therapy. R. 385. On August 28, 2013, Fakner reported urinary incontinence. R. 382.

On January 29, 2014, after the alleged disability onset date, Fakner complained of numbness in her toes and insomnia. R. 380. On May 7, 2014, her physical examination was normal. R. 431-32. On July 10, 2014, she complained of urinary problems. She denied chest pain, shortness of breath, palpitations, dyspnea on exertion, headaches, myalgias and arthralgias. R. 429-30. Physical examination was normal. R. 430. Dr. Wall's treatment note contains the following statement:

> Impression: Chronic pain followed with pain management stable but unable to work. She does have also history of 2 cerebrovascular accidents which seems to be stable with no new episodes since she has stopped working. I believe stress is a lot of her problems. She does have no new episodes of SVT since her beta blocker was increased. Her . . . anxiety is under good control also with Xanax she takes it intermittently. Regarding her urinary incontinence . . . I believe that this may never get better and that she is not a good candidate for working since she has this disability as well[.]

*Id.*

On July 30, 2014, Osama Ahmed, M.D., examined Fakner. The Review of Symptoms reflects that Fakner denied headache, chest pain and incontinence but acknowledged palpitations, shortness of breath and anxiety. Upon examination, Dr. Ahmed observed a regular heart rate and rhythm. Fakner had a normal gait, and she was able to rise from a sitting position without assistance. She could bend without difficulty and squat with pain and assistance. Her range of motion was normal. Sensation was intact, and she had 5/5 motor strength. In sum, Dr. Ahmed

8

indicated that these were normal findings. Dr. Ahmed opined that Fakner could sit, walk and/or stand for a full workday with periodic breaks, lift/carry objects less than 20 pounds, hold a conversation, respond appropriately to questions, and carry out and remember instructions. R. 396-99.

On August 6, 2014, David G. Atkins, Ph.D., prepared a mental functional capacity assessment after review of the records. He opined that Fakner had no limitation in the four areas of mental functioning. He concluded that Fakner did not have a severe mental impairment. R. 83-85.

On September 24, 2014, Patricia Alexander, M.D., examined Fakner. Upon examination, Dr. Alexander observed paralumbar tenderness on the right. Fakner's gait was normal. The assessments included lumbago; chronic urinary incontinence; and stable anxiety. R. 509-14.

On September 26, 2014, Amanda Ryan, D.O., examined Fakner as a new patient. Fakner complained of intermittent chest pain with palpitations. An electrocardiogram ("EKG") showed a sinus rhythm with no ST changes. R. 410-11. On May 13, 2015, Dr. Ryan observed that Fakner was doing well. R. 477-78.

Fakner was again examined by Dr. Nunley on October 13, 2014. She reported that she had been doing well up to a couple of months earlier when she had an onset of back pain. A Medrol Dosepak helped relieve the pain, but she still experienced pain with sitting and rising from sitting. Dr. Nunley reviewed an MRI taken on September 29, 2014 and compared it to an MRI from 2010. He noted that the disk at L3-4 had mildly worsened. There were signs of neural impingement at L4-5 and L5-S1. Dr. Nunley recommended an aggressive core exercise training program with stretching-strengthening conditioning. He observed that if this did not improve Fakner's

condition, he would probably recommend nerve root blocks or facet blocks in the lumbar spine. If conservative management failed, she could require a significant excision of her fusion possibly in the lower thoracic spine. R. 230-31.

On October 22, 2014, Robert Stainback, Ph.D., also prepared a mental functional capacity assessment after review of the records. He concluded that Fakner had, at most, mild limitations in mental functioning and that she did not have a severe mental impairment. R. 98-99.

On October 27, 2014, Patrick Sonser, M.D., who is board certified in physical medicine and rehabilitation and in pain medicine, examined Fakner. Fakner complained of exacerbation of low back pain at a level of 3 on a 10-point pain scale ("3/10") after moving boxes. Pain was worse with sitting and better with lying on her side or standing. She had intermittent paresthesias in her right foot. She also reported "chronic stable bladder dysfunction/urinary incontinence." R. 420. Upon examination, Dr. Sonser observed a non-antalgic gait, pain at range of motion in the lumbar spine, tenderness to palpation in the lumbar spine and SI joint, and full range of motion in the hip, knee and foot/ankle. Tests for pain were negative. R. 421-24. His impressions included multilevel lumbar spondylosis at L2-3 and L3-4 with inflammation in the facet joints above the fusion; bilateral sacroiliac (SI) joint dysfunction below the fusion; multilevel lumbar degenerative disease L1-2 through L3-4; and asymptomatic L2-3 and L3-4 disc displacement and spondylosis resulting in mild central stenosis and bilateral foraminal stenosis at these levels. Fakner declined a prescription to begin a new physical therapy program, stating that she was doing a core strengthening home exercise program and recently started acupuncture. She indicated that her pain was not severe enough that she wanted to pursue any interventional spine procedures. R. 425-26.

NOT FOR PUBLICATION

Dr. Sonser wrote that if low back pain persisted or progressed, "the patient may eventually benefit" from lumbar facet injection and SI joint injection. R. 426.

On November 6, 2014, Donald Morford, M.D., prepared a physical mental functional capacity assessment after review of the records. He concluded that Fakner's lumbar impairment would be expected to cause some pain as alleged. He opined that Fakner could lift up to 20 pounds occasionally and 10 pounds frequently. She could stand and/or walk and sit about 6 hours in an 8-hour workday. She could occasionally climb ramps/stairs, kneel, crouch and crawl, but never climb ladders/ropes/scaffolds. She should avoid concentrated exposure to extreme cold, heat, wetness, humidity, vibration and hazards. R. 99-102.

On December 16, 2014, Melvin Field, M.D., a neurosurgeon, met with Fakner. Upon examination, he observed some musculoskeletal spasms but no focal deficits. Her MRI showed an L4 to S1 fusion, "some mild adjacent disease at L3-L4 but no severe central stenosis or severe foraminal stenosis." R. 450. A straight-leg raising test was negative for pain, and range of motion in her spine was normal. She had 5/5 muscle strength. She also had a normal gait, and she was able to stand without difficulty. R. 454-55. Dr. Field wrote that Fakner had already improved, and he did not think surgical intervention was required. R. 450.

Medical records reflect that Fakner had a TIA on March 23, 2015 that resolved. R. 463-72.

Fakner was in an MVA on December 10, 2015, which aggravated her lower back pain. R. 483. On December 22, 2015, Dr. Alexander observed during examination that Fakner walked without difficulty. Range of motion from side to side in her back was limited due to pain, but no tenderness on palpation was observed. R. 486.

11

On February 26, 2016, Fakner was examined by Brianna Love, PA-C, in the practice group of Robert Simon, M.D., an orthopedist. Examination revealed full range of motion in the shoulder with slight tenderness of palpation between the shoulders. Fakner walked with an antalgic gait. Moderate tenderness on palpation was noted over the lumbar region, with some decreased range of motion. Straight-leg raising tests were negative for pain. PA Love noted that Fakner's symptoms had been well managed and controlled prior to the MVA. Fakner reported that she was feeling much better, and she elected to continue conservative care. R. 545-48.

X-rays taken on February 8, 2016 revealed a trigger thumb in Fakner's left hand and Dupuytren's disease in the palm of the left hand. R. 516.

Dr. Simon evaluated Fakner on April 14, 2016. At that time, she complained of neck pain at 3/10 and low back pain at 4/10 with headaches. Upon examination, severe tenderness was noted in the right hip and some tenderness in the right gluteal region and right SI region. Also, Dr. Simon observed significant tenderness with spasm and guarding in the cervical paraspinals and trapezii. Straight-leg raising and extension tests were negative. Dr. Simon continued conservative care. R. 543.

On May 18, 2016, Dr. Simon administered injections for pain. R. 541. On May 31, 2016, Fakner reported marked improvement in hip pain and low back pain, although low back pain worsened with activity. Upon examination, Dr. Simon observed much less tenderness in the lumbar spine with some spasm and much less tenderness in the gluteal and hip region. He permitted Fakner to continue with activity as tolerated. R. 540. On June 30, 2016, Fakner reported that she was "doing quite well," with some pain off and on that was more significant with walking and bending. Upon examination, Dr. Simon observed significant tenderness with spasm

and guarding in the lumbosacral and sacroiliac region, but markedly less than on previous examination. He noted that patients have exacerbations 2 to 3 times a year. R. 538-39. He also opined that Fakner was a candidate for fusion of the SI joints and that she may need additional fusion at L3-4 and possibly at L2-3. He rated Fakner at an 8% permanent physical impairment. R. 539.

*Vocational Expert Testimony.*

During the ALJ's hearing, the VE testified that Fakner's work as a pediatrician was a light, skilled (SVP 8) position. R. 61. Her work as a medical consultant was a sedentary, skilled (SVP 8) position. *Id.*

The ALJ asked the VE to assume a hypothetical person of Fakner's age, education and work history who had the RFC the ALJ assessed for Fakner. R. 63. The VE testified that this person could perform Fakner's previous work as a medical consultant. This person could also perform other sedentary jobs available in the national economy, including telephone solicitor; receptionist; and order clerk. *Id.* If the person would be off task at least 20% of the time for bathroom breaks and rest periods, there would be no work the person could perform. R. 65.

**ANALYSIS.**

In the Joint Memorandum, which I have reviewed, counsel for Fakner asserts three assignments of error. Counsel contends that the ALJ erred by giving little weight to the opinion of Dr. Wall that Fakner was a good candidate for disability. Counsel also argues that the ALJ erred by giving only partial weight to the statements of Fakner and her husband about her functional limitations. Doc. No. 12, at 16, 21, 27. These are the only issues I will address.

NOT FOR PUBLICATION

*Opinions of Dr. Wall.*

Dr. Wall was one of Fakner's treating physicians. In 2014, Dr. Wall opined as follows:

> Impression: Chronic pain followed with pain management stable but unable to work. She does have also history of 2 cerebrovascular accidents which seems to be stable with no new episodes since she has stopped working. I believe stress is a lot of her problems. She does have no new episodes of SVT since her beta blocker was increased. Her . . . anxiety is under good control also with Xanax she takes it intermittently. Regarding her urinary incontinence . . . I believe that this may never get better and that she is not a good candidate for working since she has this disability as well[.]

R. 430. Counsel for Fakner contends that the failure to give this opinion substantial weight was error.

The opinion of a treating physician "'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'" *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's medical records. *Id.* at 1240-41 (citing *Lewis*, 125 F.3d at 1440). The ALJ must articulate the reasons for giving less weight to the opinion of a treating physician. *Lewis*, 125 F.3d at 1440.

The ALJ gave little weight to Dr. Wall's opinion because it was not supported by specific objective findings and it was inconsistent with the record as a whole. R. 21. The ALJ's findings are supported by substantial evidence. In his opinion, Dr. Wall stated that Fakner's pain was stable with pain management. She had no new episodes of SVT since medication for this condition was increased. Her anxiety was under good control with intermittent use of Xanax. These observations undermine Dr. Wall's conclusion that Fakner was a good candidate for disability.

14

NOT FOR PUBLICATION

The ALJ was also correct that Dr. Wall's opinion is not supported by the record as a whole. After the alleged disability onset date, Dr. Wall's examinations of Fakner were normal. Other medical records after the alleged disability onset date also undermine the conclusion that Fakner was not able to work. On July 30, 2014, Dr. Ahmed observed that Fakner had a normal gait, could rise from a sitting position without assistance and could bend without difficulty. Her range of motion was normal, sensation was intact, and she had 5/5 motor strength. On October 13, 2014, Fakner reported that she had been doing well until she strained her back moving boxes in October 2014. Dr. Nunley recommended an aggressive core exercise training program with stretching-strengthening conditioning. Later that month, Fakner told Dr. Sonser that her pain was not severe enough to warrant interventional spine procedures. In December 2014, Dr. Field noted that Fakner had improved and that surgical intervention was not required. Even though Fakner had exacerbation of her pain after the December 2015 MVA, this occurred well after Dr. Wall opined that Fakner was a good candidate for disability and, therefore, is not evidence that Dr. Wall relied on to support his opinion. All of these facts support the ALJ's decision to give little weight to Dr. Wall's opinion.

For these reasons, I recommend that the Court find that the first assignment of error is unavailing.

NOT FOR PUBLICATION

*Statements of Fakner and Her Husband.*

Counsel for Fakner also argues that the ALJ erred by finding that Fakner's statements of her functional limitations were only partially consistent with the record and by giving only partial weight to the statement of her husband, Dr. Ethan Alan Webb.

If an ALJ decides not to credit a claimant's testimony as to pain and other subjective symptoms, he must articulate explicit and adequate reasons for doing so. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995) (citations omitted). An ALJ must also state the weight afforded to the testimony of lay witnesses. *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990). In this case, the ALJ complied with these requirements.

As to Fakner's reports of her limitations, the ALJ cited to the objective medical evidence, Fakner's treatment history and her daily activities to support the conclusion that her testimony was only partially consistent with the record. Substantial evidence supports these explicitly articulated reasons. As discussed in the analysis of the first assignment of error, during the alleged disability period before Fakner's December 2015 MVA, her physical examinations were essentially normal, and her pain was largely controlled with medication. Records show her anxiety was stable with intermittent use of Xanax. While she suffered from incontinence, this condition was stable with medication and mitigated by wearing pads for leakage and regularly using the restroom. She was able to participate in core strengthening exercises, walk about a mile 3 times per week, walk 2 small dogs on fairly flat terrain, drive a car, fly on an airplane, drive her daughter to and from school and prepare simple dinners.

Counsel for Fakner argues that it was inappropriate for the ALJ to consider activities of daily living in making a credibility finding. While counsel is correct that activities of daily living

NOT FOR PUBLICATION

are generally not dispositive of a claimant's ability to perform substantial gainful activity, SSA regulations require an ALJ to consider daily activities among other evidence in determining the claimant's ability to work. 20 C.F.R. § 404.1529(a), (c); *see also Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987).

Finally, counsel for Fakner contends that the ALJ erred by giving only partial weight to the statement of Fakner's husband because the ALJ described him as "a lay source whose opinion is based only on casual observation." R. 21. Counsel notes that the record establishes that Fakner's husband is an internal medicine physician, not a lay source. However, Dr. Webb's written statement is not based on medical testing and treatment. Rather, it related to his personal interactions with Fakner, often on evenings and weekends, and his observations of her functional capacity. Therefore, the ALJ did not err by treating his opinion as that of a lay source rather than a medical professional. Additionally, as counsel for the Commissioner argues, Dr. Webb's statements were cumulative of the information provided by Fakner. As discussed above, the ALJ relied on substantial evidence in the record to support the determination that Fakner's reports of her functional limitations were only partially consistent with the evidence in the record.

For these reasons, I recommend that the Court find that the last two assignments of error are not meritorious.

NOT FOR PUBLICATION

## RECOMMENDATIONS.

For the reasons stated above, it is **RESPECTFULLY RECOMMENDED** that the final decision of the Commissioner be **AFFIRMED**. I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its Order on the Report and Recommendation and, thereafter, to close the file.

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

**RESPECTFULLY RECOMMENDED** this 21st day of November, 2018.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE